Citation Nr: 1708252 
Decision Date: 03/17/17 Archive Date: 04/03/17

DOCKET NO. 07-02 039 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Pittsburgh, Pennsylvania


THE ISSUES

1. Entitlement to an initial rating for peripheral vascular disease of the right lower extremity, rated 20 percent disabling prior to December 19, 2011, and 60 percent therefrom. 

2. Entitlement to an initial rating for peripheral vascular disease of the left lower extremity, rated 20 percent disabling prior to December 19, 2011, and 60 percent therefrom. 

3. Entitlement to a total rating based on individual unemployability due to service connected disabilities (TDIU). 


REPRESENTATION

Appellant represented by: Disabled American Veterans



ATTORNEY FOR THE BOARD

Joseph P. Gervasio, Counsel


INTRODUCTION

The Veteran, who is the appellant, served on active duty from June 1960 to June 1964. 

This case comes to the Board of Veterans' Appeals (Board) on appeal of a March 2005 rating decision of the Pittsburgh, Pennsylvania, Regional Office (RO) of the Department of Veterans Affairs (VA), which effectuated a February 2005 Board decision that granted service connection for peripheral vascular disease of each lower extremity. The Veteran appealed the 20 percent ratings awarded by the RO, effective in May 1998. 

The case was remanded by the Board in December 2009 and September 2011 for further development of the evidence. This was accomplished and, following the September 2011 remand, the rating for peripheral vascular disease of each lower extremity was increased to 60 percent. As the Veteran has not stated that he is satisfied with these ratings and they are less than the maximum under the applicable criteria, the claims remain on appeal. See AB v. Brown, 6 Vet. App. 35 (1993). 


FINDINGS OF FACT

1. Prior to May 11, 2000, the Veteran's bilateral peripheral vascular disease was manifested by ankle/brachial index (ABI) testing with readings of 0.75 in the right lower extremity and 0.73 in the left lower extremity. 

2. On May 10, 2000, the Veteran was noted to have severe claudication bilaterally, worse on the left than the right, with ABI readings of 0.57 on the right and 0.47 on the left. 

3. On August 9, 2006, an ABI reading of 0.94 on the left and 0.76 on the right was documented. 

4. On December 19, 2011, the peripheral neuropathy of each lower extremity was primarily manifested by claudication in both lower extremities on walking less than 25 yards on a level grade at two miles per hour, persistent coldness, diminished peripheral pulses, trophic changes, the absence of hair, dystrophic nails; without ischemic ulcers, aneurisms of a small artery, or ulcerations. ABI testing performed in March 2011 showed 0.76 in the right leg and 0.94 in the left. 

5. During the pendency of this appeal, service connection has been found for peripheral vascular disease of each lower extremity, rated 20 percent disabling in each lower extremity from May 1998 to May 10, 2000; 40 percent disabling in each lower extremity from May 11, 2000, to August 8, 2010; 20 percent disabling in each lower extremity from August 9, 2010, to December 18, 2011, and 60 percent disabling for each lower extremity from December 19, 2011. In addition service connection is in effect for coronary artery disease, rated 10 percent disabling from February 1999 to June 26, 2006, following which the rating was increased to 30 percent. The combined evaluations of the Veteran's service-connected disabilities was 40 percent from May 1998 to February 1999, when the combined rating increased to 50 percent. The combined rating increased to 70 percent as of May 11, 2000, then to 80 percent as of June 27, 2006. The combined rating was reduced to 70 percent with the reduction of the ratings for peripheral vascular disease of each lower extremity on August 9, 2010, but then increased to the current combined rating of 90 percent as of December 19, 2011. 
 
6. The veteran reported that he had four years of high school education and work experience in construction, including roofing and carpentry. 

7. The service-connected disabilities, standing alone, are shown to be of such severity as to effectively preclude all forms of substantially gainful employment from December 19, 2011. 


CONCLUSIONS OF LAW

1. The criteria for an initial rating in excess of 20 percent for peripheral vascular disease of the left lower extremity were not met prior to May 11, 2000. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

2. The criteria for an initial rating in excess of 20 percent for peripheral vascular disease of the right lower extremity were not met prior to May 11, 2000. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

3. The criteria for an increased rating of 40 percent for peripheral vascular disease of the left lower extremity were met from May 11, 2000, to August 8, 2006. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

4. The criteria for an increased rating of 40 percent for peripheral vascular disease of the right lower extremity were met from May 11, 2000, to August 8, 2006. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

5. The criteria for a rating in excess of 20 percent for peripheral vascular disease of the left lower extremity were not met from August 9, 2006, to December 18, 2011. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

6. The criteria for a rating in excess of 20 percent for peripheral vascular disease of the right lower extremity were not met from August 9, 2006, to December 18, 2011. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

7. The criteria for a rating in excess of 60 percent for peripheral vascular disease of the left lower extremity were not met from December 19, 2011. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

8. The criteria for a rating in excess of 60 percent for peripheral vascular disease of the right lower extremity were not met from December 19, 2011. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7114 (2016).

9. The requirements for TDIU were met as of December 19, 2011. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.321, 3.340, 4.16 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

VA's duty to notify was satisfied by a letter dated in December 2009. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015).

With regard to the duty to assist, the Veteran's service treatment records (STRs) and pertinent post-service treatment records, including records utilized in a disability determination by the Social Security Administration (SSA), have been secured. The Veteran was afforded VA medical examinations, most recently in December 2011. The Board finds that the opinions obtained are adequate. The opinions were provided by qualified medical professionals and were predicated on a full reading of all available records. The examiners also provided a detailed rationale for the opinions rendered. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007); see also Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008). Neither the Veteran nor the representative has challenged the adequacy of the examination obtained. Sickels v. Shinseki, 643 F.3d 1362 (Fed. Cir. 2011) (holding that the Board is entitled to presume the competence of a VA examiner and the adequacy of his opinion). Accordingly, the Board finds that VA's duty to assist, including with respect to obtaining a VA examination or opinion, has been met. 38 C.F.R. § 3.159(c)(4) (2016). 

Increased Rating Laws and Regulations

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Rating Schedule) found in 38 C.F.R. Part 4. 38 U.S.C.A. § 1155. It is not expected that all cases will show all the findings specified; however, findings sufficiently characteristic to identify the disease and the disability therefrom and coordination of rating with impairment of function will be expected in all instances. 38 C.F.R. § 4.21 (2016). 

Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 4.3 (2016). 

In this case, the Board has considered the entire period of initial rating claim from May 1998 to see if the evidence warrants the assignment of different ratings for different periods of time during these claims, a practice known as "staged" ratings. Fenderson v. West, 12 Vet. App. 119 (1999).

The Board notes that it has reviewed all of the evidence in the Veteran's claims file, with an emphasis on the evidence relevant to these appeals. Although the Board has an obligation to provide reasons and bases supporting its decision, there is no need to discuss, in detail, every piece of evidence of record. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (holding that VA must review the entire record, but does not have to discuss each piece of evidence). Hence, the Board will summarize the relevant evidence where appropriate and the Board's analysis below will focus specifically on what the evidence shows, or fails to show, as to the claims. 

Lay statements may support a claim for service connection by establishing the occurrence of lay-observable events or the presence of disability or symptoms of disability subject to lay observation. 38 U.S.C.A. § 1153(a); 38 C.F.R. § 3.303(a) (2016); Jandreau v. Nicholson, 492 F.3d 1372 (Fed Cir. 2007); Buchanan v. Nicholson, 451 F.3d 1331, 1336 (Fed. Cir. 2006). Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), they are not competent to provide opinions on medical issues that fall outside the realm of common knowledge of a lay person. See Jandreau, 492 F.3d 1372. Competency must be distinguished from weight and credibility, which are factual determinations going to the probative value of the evidence. Rucker v. Brown, 10 Vet. App. 67, 74 (1997).

Peripheral Vascular Disease of each Lower Extremity

Service connection for peripheral vascular disease of each leg was granted by the RO in a March 2005 rating decision. A 20 percent initial disability rating was awarded for each lower extremity as arteriosclerosis obliterans (ASO) on the basis of Code 7114 from the date of claim in May 1998. 

Diseases of the heart and cardiovascular system are rated under 38 C.F.R. § 4.104; ASO is rated under the provisions of Code 7114. A 20 percent rating is warranted for peripheral vascular disease when it is manifested by claudication on walking more than 100 yards, and; diminished peripheral pulses or an ABI of 0.9 or less. A rating of 40 percent is assigned for claudication on walking between 25 and 100 yards on a level grade at two miles per hour; and, trophic changes (thin skin, absence of hair, dystrophic nails) or ABI of 0.7 or less. A rating of 60 percent is assigned for claudication on walking less than 25 yards on a level grade at two miles per hour; and, either persistent coldness of the extremity or ABI of 0.5 or less. A rating of 100 percent is assigned for ischemic limb pain at rest; and, either deep ischemic ulcers or ABI of 0.4 or less. 38 C.F.R. § 4.114, Code 7114.

Note (1) to Code 7114 states the ABI is the ratio of the systolic blood pressure at the ankle (determined by Doppler study) divided by the simultaneous brachial artery systolic blood pressure. The normal index is 1.0 or greater. Note (2) to Code 7114 states that residuals of aortic and large arterial bypass surgery are evaluated as ASO. Note (3) to Code 7114 states that these evaluations are for involvement of a single extremity. If more than one extremity is affected, each extremity is evaluated separately and combined under § 4.25, using the bilateral factor (§ 4.26) if applicable.

As noted, service connection for peripheral vascular disease of each lower extremity was granted effective in May 1998. Private treatment records dated in May 1998 include an arterial evaluation that showed an ABI of 0.75 in the right lower extremity and 0.73 in the left lower extremity. Subsequent treatment records, dated on May 11, 2000, show that the Veteran was seen with a history of severe claudication bilaterally, worse on the left than the right. ABI at that time was 0.57 on the right and 0.47 on the left. He had had a previous balloon angioplasty of the left several years earlier, but now likely had recurrent disease. A stent was surgically implanted on the left in November 2000. 

An examination was conducted by VA in February 2003. At that time, the examiner noted that the Veteran had undergone an angioplasty with placement of two stents in the left femoral artery in November 2000. He reported that his symptoms had improved since that time, although long distance walking continued to cause leg pains. He said that he occasionally road a stationary bicycle. On examination he had 2+ femoral pulses bilaterally, 1+ dorsalis pedis pulse bilaterally, and posterior tibial pulses of 2+ on the right and 1+ on the left. His feet were cool to the touch in the toes, but not cold. He had no discoloration of the legs or toenail nail beds. He did have thick yellowed toenails throughout. With a period of sitting, he did not gain any dusky or dark hue to the lower extremities. There was no effusion noted and, though he had sparse hair of the lower extremities, there were still a few hairs present. Sensation was intact on examination. He stated that he got leg pain after walking a couple of blocks. (The examiner did describe that the Veteran reported having recently dragged a 200 pound deer out of the woods, but in correspondence received from the Veteran, he vehemently denied having done so, stating that the deer weighed approximately 75 pounds.) 

An examination was conducted by VA in June 2006. At that time, the Veteran reported that his legs ached after about one and a half blocks of ambulation and that it was worse in the winter. He had exercise problems because he could not walk as far as previously. He had residual effects on his usual occupational and daily activities. He had been retired since 1998, but remained independent in his activities of daily living. He just could not ambulate very far because of intermittent claudication symptoms. On physical examination, pedal pulses were normal in the left lower extremity, but diminished in the right lower extremity. The diagnosis was bilateral lower extremity peripheral vascular disease. Testing performed on August 9, 2006, showed that the Veteran had an ABI index of 0.94 on the left and 0.76 on the right. The Veteran was advised to pursue an exercise program. 

VA treatment records show that in November 2009, the Veteran was seen for complaints of chest discomfort. During the evaluation, it was also noted that he had complaints of peripheral vascular disease for which he had undergone stent placement in the past. Examination of the extremities revealed no pedal edema. Pulsations were not felt below the popliteals. 

An examination was conducted by VA in March 2010. At that time, the stent placement in the left femoral artery in November 2000 was noted as was the Veteran's history of right leg intermittent claudication symptoms. It was noted that March 2007 Doppler studies had shown poor ABI values from the lower thighs down, worse on the right side. Studies performed in March 2008 and April 2009 continued to show moderate peripheral vascular disease on the right and mild disease on the left. On physical examination, the Veteran had bilateral femoral bruits heard, but pulsations were felt, less so on the right. Dorsal pedis was palpable on the right, but diminished and more easily palpable on the left. The posterior tibial pulse was palpable bilaterally, but stronger on the left. The lower extremity skin was dry and of normal turgor. There was no erythema. Hair was faded away in the distal one-half of both lower legs. A few toe hairs were still present. The nails were yellowed and thickened with mycotic debris. Lower extremity temperature was warm with no edema. There were no skin ulcerations and no ischemic pain at rest. Ambulation appeared to be normal. ABI testing performed in April 2010 showed 0.71 on the right and 0.91 on the left. These readings were said to be basically unchanged from the 2009 study results. The pertinent diagnoses were bilateral lower extremity peripheral vascular disease and secondary intermittent lower extremity claudication. 

An examination was conducted by VA on December 19, 2011. At that time, the diagnosis was peripheral vascular disease of the lower extremities. The Veteran's history of this disease was reviewed. His current symptoms were of claudication on a daily basis in both legs, the right being more severe than the left. He had an achiness and cramps when walking or doing any activity with the lower extremities. If he continued with the activity, he experienced numbness and weakness, which caused him to rest frequently. His exercise tolerance varied from day to day, with the ability to walk up to 1000 feet on level terrain on a good day, but only 20 to 30 feet on days when he had significant symptoms. He also noted a constant decreased sensation to the legs from just below the knees distally. He did not have claudication symptoms while resting, although he sometimes had mild occasional cramps and numbness at rest. Since the stent implantation in 2000, he had not had other treatments other than medications, which included aspirin, rosuvastatin and amlodipine. Regarding the severity of the Veteran's disability, it was noted that he had claudication in both lower extremities on walking less than 25 yards on a level grade at two miles per hour, persistent coldness, diminished peripheral pulses and trophic changes such as thin skin, the absence of hair or dystrophic nails of both lower extremities. He was not noted to have ischemic ulcers or aneurisms of a small artery. Bilaterally, the legs appeared to be generally normal with a minimal edema. Pulses were nonpalpable in each foot in both the posterior tibial and dorsalis pedis arteries. Skin had a mild dryness diffusely, but no ulcerations or color changes. Sensation was mildly decreased to light touch in both feet. The skin of the shins was mildly shiny and absent hair to about half way up the tibial surface. ABI testing performed in March 2011 had shown 0.76 in the right leg and 0.94 in the left. 

When service connection was first made effective in May 1998, the Veteran's symptoms were significant for ABI testing with readings of 0.75 in the right lower extremity and 0.73 in the left lower extremity. These levels are not sufficient to meet the schedular criteria for a rating in excess of the initial 20 percent that was assigned. On May 11, 2000; however, the Veteran was noted to have severe claudication bilaterally, worse on the left than the right, with ABI readings of 0.57 on the right and 0.47 on the left. Under the schedular criteria outlined above, such readings directly correspond to a 40 percent rating. As such, a rating of 40 percent is shown to be warranted in each of the Veteran's lower extremities as of that date. 

Shortly thereafter, the Veteran underwent a stent procedure on the left, with noticeable improvement in his symptoms. For example, he stated that he occasionally road a stationary bicycle, but still got leg pain after walking a "couple of blocks." While examination showed intact pulses bilaterally, his feet were cold to the touch, had thickened toenails throughout, and only sparse hair growth. Significantly, no ABI testing was performed at that time and the precise length of distance the Veteran was able to walk without claudication was not specifically detailed. As such, the Board finds insufficient evidence from this examination to reduce the 40 percent rating. Similarly, the June 2006 examination report only reported the distance that the Veteran was able to walk in terms of "one and a half blocks," without further elaboration. This examination report, too, failed to include ABI testing. 

On August 9, 2006, ABI testing clearly showed improvement of the Veteran's symptoms. At that time readings of 0.94 on the left and 0.76 on the right were documented. Examinations following this testing showed results such as pulsations being felt; the skin to be dry and of normal turgor; no erythema; hair that was faded, but still present; mycotic nails; and no edema; without skin ulcerations, ischemic pain at rest or abnormal ambulation. ABI testing performed in April 2010 showed 0.71 on the right and 0.91 on the left. As such, improvement is shown. There was no evidence of claudication on walking between 25 and 100 yards on a level grade at two miles per hour, trophic changes, or ABI of 0.7 or less and a rating in excess of 20 percent is not shown to be warranted.

On December 19, 2011, the Veteran was evaluated by VA when symptoms that met the criteria for a 60 percent rating were identified. The Veteran's rating was increased to 60 percent as of that date. For a rating in excess of 60 percent, ischemic limb pain at rest; and, either deep ischemic ulcers or ABI of 0.4 or less would have to be demonstrated. As noted above, ABI testing performed in March 2011 showed 0.76 in the right leg and 0.94 in the left, and the examination report showed no evidence of ischemic limb pain at rest or deep ischemic ulcers. As the criteria for a rating in excess of 60 percent have not been demonstrated in the record, an increased rating is not warranted. 

The Board also has considered whether referral for extraschedular consideration is warranted. An extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. 38 C.F.R. § 3.321(b)(1) (2009); see Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a veteran is entitled to an extraschedular rating. First, the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the Board must determine whether the claimant's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the VA Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether the veteran's disability picture requires the assignment of an extraschedular rating. 

In this case, comparing the Veteran's disability level and symptomatology to the rating schedule, the degree of disability throughout the appeal period under consideration is contemplated by the rating schedule. The Veteran's bilateral peripheral vascular disease directly corresponds to the schedular criteria for the ratings that have been assigned. The findings of the examination reports are specifically contemplated in the schedular rating criteria. For this reason, the Board finds that the assigned schedular ratings are adequate to rate the Veteran's peripheral vascular disease, and no referral for an extraschedular rating is required. 

Additionally, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual condition fails to capture all the service-connected disabilities experienced. In this case, even after applying the benefit of the doubt under Mittleider v. West, 11 Vet. App. 181 (1998), there are no additional symptoms that have not been attributed to a specific service-connected condition. This includes the Veteran's ishemic heart disease, which will be considered in the portion of the decision that addresses TDIU. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions. Thus, referral for assignment of an extraschedular evaluation in this case is not in order. Floyd v. Brown, 9 Vet. App. 88, 95 (1996); Bagwell v. Brown, 9 Vet. App. 337 (1996).

TDIU

The remaining issue on appeal involves TDIU, which was found by the Board to be reasonably raised by the record. See Rice v. Shinseki, 22 Vet. App. 447 (2009) (suggesting, in an effective date appeal, that an appeal for higher rating somehow includes TDIU, or that a TDIU must arise from an increased rating claim, unless it is the veteran who raises the TDIU claim). Correspondence from the Veteran indicates that he has been unemployed since 1998, when he was found eligible for SSA benefits. 

Total disability ratings for compensation may be assigned where the schedular rating is less than total, when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability ratable at 60 percent or more, or as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. When these percentage standards are not met, consideration may be given to entitlement on an extraschedular basis, taking into account such factors as the extent of the service-connected disability, and employment and educational background. It must be shown that the service-connected disability produces unemployability without regard to advancing age. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.321, 3.340, 3.341, 4.16, 4.19.

The Veteran's appeal is from the initial ratings of his peripheral vascular disease, which, as noted above, have been found to be rated 20 percent disabling in each lower extremity from May 1998 to May 11, 2000; 40 percent disabling in each lower extremity from May 11, 2000, to August 9, 2010; 20 percent disabling in each lower extremity from August 9, 2010, to December 19, 2011, and 60 percent disabling for each lower extremity from December 19, 2011. In addition service connection is in effect for coronary artery disease, rated 10 percent disabling from February 1999 to June 27, 2006, when the rating was increase to 30 percent. The combined evaluations of the Veteran's service-connected disabilities was 40 percent from May 1998 to February 1999, when the combined rating increased to 50 percent. The combined rating increased to 70 percent as of May 11, 2000, then to 80 percent as of June 27, 2006. The combined rating was reduced to 70 percent with the reduction of peripheral vascular disease of each lower extremity on August 9, 2010, but then increased to the current combined rating of 90 percent as of December 19, 2011. The Veteran's three service connected disabilities are of a common etiology. He has met the schedular criteria for consideration of TDIU since May 11, 2000. 

In his application for compensation benefits, the Veteran indicated that he had four years of high school education. In documentation submitted in connection with an SSA disability application, he indicated that he was self-employed as a carpenter. He has also stated that he worked in construction, including as a roofer. 

After review of the record, the Board finds that the Veteran is entitled to TDIU as of December 19, 2011. In this regard, it is noted that prior to that date, there are indications that, while he was not employed, his disabilities were not so extensive as to take him outside the norm of a similarly rated Veteran. The Board notes that for a veteran to prevail on a claim for a TIDU, the record must reflect some factor which takes his case outside of the norm. The sole fact that he is unemployed or has difficulty obtaining employment is not enough. A high rating in itself is recognition that the impairment makes it difficult to obtain and keep employment. The question is whether the veteran is capable of performing the physical and mental acts required by employment, not whether he can find employment. Van Hoose v. Brown, 4 Vet. App. 361 (1993). In this case the record prior to December 19, 2011 includes references to the Veteran being able to ride a stationary bicycle and to engage in hunting. While he did competently state that he was never able to pull a 200 pound deer from a forest, he did state that he was able to drag one that weighed approximately 75 pounds some distance. He reported having had improvement after his November 2000 stent procedure, being able to walk several blocks before the start of leg pain. Examinations showed pulsations being felt in the legs; the skin to be dry and of normal turgor; no erythema; hair that was faded, but still present; mycotic nails; and no edema. The Veteran was able to ambulate normally and ABI testing showed 0.71 on the right and 0.91 on the left. 

The December 2011 VA examination noted that, regarding the ability to work, the examiner reported that the Veteran had retired in 1998 due to a combination of cardiac and peripheral vascular disease conditions. He reported that he would not be able to perform construction work, which was physical labor, properly. He had fatigue and leg pains with prolonged walking, climbing, lifting, carrying and squatting. He had done roof work, but noted that, when his symptoms became more significant he would have leg weakness and balance problems, so he had to stop this due to safety reasons. He would have to take frequent breaks during a work day. He reported that he would be able to do sedentary work, but would have mild leg cramping and a cold sensation in his feet. He stated that any type of physical activity such as chores, recreational activities such as hunting or fishing, exercising, and shopping, would require him to take frequent rest breaks for his legs. He could perform the activities of daily living such as bathing, dressing, grooming, eating, cooking, and toileting. While driving, he sometimes needed to take rest breaks every one to two hours due to leg symptoms. 

After consideration of the record, including the Veteran's prior work history and education, the Board is not persuaded that the Veteran is able to maintain substantially gainful employment, including sedentary work. While the VA examiner in December 2011 believed that the Veteran was capable of sedentary work, this appears to be primarily based on the Veteran's own statement that he could do so. The examination report itself shows; however, that he had leg cramping and cold sensations in his feet at rest. He would have to take frequent breaks and was unable to drive for more than one or two hours at a time. His sole work experience was in some form of construction, which is primarily manual labor and his high school education would make it difficult for him to obtain or retain employment that is less physically taxing. As such, with the resolution of reasonable doubt, the Board finds that TDIU is warranted from December 19, 2011. 


ORDER

Entitlement to a rating in excess of 20 percent for peripheral neuropathy of the left lower extremity prior to May 11, 2000, is denied. 

Entitlement to a rating in excess of 20 percent for peripheral neuropathy of the right lower extremity prior to May 11, 2000, is denied. 

Entitlement to a staged rating of 40 percent for peripheral neuropathy of the left lower extremity from May 11, 2000, to August 8, 2006, is granted, subject to the controlling regulations governing the payment of monetary benefits. 

Entitlement to a staged rating of 40 percent for peripheral neuropathy of the right lower extremity from May 11, 2000, to August 8, 2006, is granted, subject to the controlling regulations governing the payment of monetary benefits. 

Entitlement to a staged rating in excess of 20 percent for peripheral neuropathy of the left lower extremity between August 9, 2006, and December 18, 2011, is denied. 

Entitlement to a staged rating in excess of 20 percent for peripheral neuropathy of the right lower extremity between August 9, 2006, and December 18, 2011, is denied. 

Entitlement to a rating in excess of 60 percent for peripheral neuropathy of the left lower extremity from December 19, 2011, is denied. 

Entitlement to a rating in excess of 60 percent for peripheral neuropathy of the right lower extremity from December 19, 2011, is denied. 

Entitlement to TDIU is granted from December 19, 2011. 



____________________________________________
KELLI A. KORDICH
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs